UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Richard P. Landers,

Plaintiff,

v.

The National Railroad Passenger Corporation, d/b/a Amtrak,

Defendant.

Civil File No. 00-2233 (PAM/JGL)

**MEMORANDUM AND ORDER**

---

This case arises from Plaintiff Richard P. Landers' suit against Defendant The National Railroad Passenger Corporation, d/b/a Amtrak ("Amtrak") for disability discrimination in employment under the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363.01 et seq., defamation, and breach of contract.[1] This matter is before the Court on Defendant's Motion for Summary Judgment. For the following reasons, the Court grants in part and denies in part Defendant's Motion.

**BACKGROUND**

Landers began working for Amtrak in 1974. By the time of his termination on March 9, 2001, he was a Service Manager in the St. Paul Depot. As a Service Manager, Landers was responsible for managing the Amtrak stations between Columbus, Wisconsin and the

---

[1] Plaintiff has stipulated to the dismissal of his age discrimination claim under the MHRA.

FILED DEC 28 2001
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD________
DEPUTY CLERK________

Montana border.

Landers claims that he was terminated because he had Bell's palsy, which he contracted in December 1996. For the first few months after the onset of his Bell's palsy, Landers claims that he suffered from painful headaches and that he was beset with other difficulties as a result of the paralysis including trouble eating, drinking, and driving. Many of these symptoms persisted throughout the first few months after he contracted Bell's palsy. In February 1997, Landers received steroid treatments and had surgery for nerve decompression in an attempt correct his partial paralysis. By November 1997, Landers showed improvement, and by June 1998, Landers had regained 70 to 80 percent of his facial functioning. (See Friedman Aff. Ex. 11.) He is now able to communicate clearly, although if he becomes excited he must talk more slowly to be understood (see Landers Dep. at 172-73); he is able to eat and drink, although he must avoid taking large mouthfuls of liquids (see id. at 160); he is able to drive (see id. at 162-63); and he is able to get around without assistance. (See id. at 176.) He has testified, in fact, that he was able to satisfy all his job responsibilities. (See id. at 184-85.) Allegedly, however, he has been battling depression and has had difficulty organizing his thoughts and getting things done in a timely fashion. Accordingly, Landers was given a prescription for Paxil. (See id. Ex. 13.)

Amtrak contends that Landers was terminated pursuant to a policy implemented by Amtrak to improve its efficiency and reduce its management costs. Because Amtrak is a congressionally chartered organization, it is responsible not only to its board of directors, but

also to Congress. In 1997, Amtrak was over $1 billion in debt. Accordingly, Congress passed the Amtrak Reform and Accountability Act of 1997, 49 U.S.C. § 24101, which among other things directed Amtrak to reduce management costs and increase employee productivity. Ostensibly responding to this mandate, Amtrak adopted a "service standards initiative" in 1999. As a part of this initiative, Amtrak hired a private human resources consulting company, Personnel Decisions, Inc. ("PDI") to develop a performance ranking system for mangers. The final result was a system whereby managers would be ranked and those who fell in the bottom ten percent of the ranking would be terminated.

This new performance management system involved a review process which included (1) a review conducted by both the employee's direct supervisor and a secondary supervisor and (2) a "360 -degree" review (also referred to by the parties as the "multi-rater") conducted by a group of peers selected by the employee. Because the goal of this system was to replace poor performing managers, Amtrak concedes that this is not a reduction-in-force case.

On February 22, 1999, the President of Amtrak issued a memorandum describing the review process. The review covered a manager's performance for Amtrak's 1999 fiscal year, October 1, 1998, to September 30, 1999. Landers was aware of the review process and aware of the fact that the bottom ten percent of managers were going to be terminated. (See Landers Dep. at 194-95.) During the summer of 1999, all Amtrak managers were required to attend training sessions regarding the review process.

Consistent with the process, Landers had agreed to goals for the 1999 fiscal year with

his direct supervisor, Gary Erford. In November 1999, Erford completed a draft performance review for Landers and sent it to a secondary reviewer, Joy Smith. Erford's draft review gave Landers four "7" ratings and three "3" ratings. According to Amtrak, Smith believed that Erford was too generous with his ratings in general, because he was protective of his employees. Smith therefore lowered the ratings for all five of the mangers under Erford's supervision. (See Smith Dep. at 119-20, 131.) Smith lowered Landers' score so that it consisted of two "2" ratings and five "3" ratings. (See Landers Dep. Ex. 31.) A "2" rating was defined as "rarely met expectations," and a "3" rating was defined as "met expectations, partially achieved goals."

After the reviews were completed, the numerical ratings were forwarded to PDI. PDI then tabulated the results and generated lists of managers raked by overall score for each business unit in Amtrak. Landers ranked 266th out of 274 in the InterCity Business Unit. (See Walker Dep. Ex. 12.) Amtrak contends that because Landers was ranked in the bottom ten percent of managers, he was terminated. According to Amtrak, Smith's ratings were concordant with Landers' performance during and before the 1999 fiscal year.

Landers has now brought this suit alleging disability discrimination in violation of the MHRA, defamation, and breach of his employment contract.

## DISCUSSION

### A. Summary Judgment Standard

Summary judgment is only proper if there are no disputed issues of material fact and

the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219-20 (8th Cir. 1992). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. Enterprise Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Id. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, and must do more than simply show that there is some metaphysical doubt as to the material facts. Matsushita Elec. Indus Co v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The opposing party must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik, 47 F.3d at 957. However, because discrimination cases often turn on inferences rather than on direct evidence, courts are more deferential to the non-moving party alleging discrimination. Webb v. Garlick Mfg. Co., 94 F.3d 484, 486 (8th Cir. 1996).

**B. Landers' Claims**

**1. Disability Discrimination**

Landers has filed a claim for disability discrimination under the MHRA. Like its

federal counterparts, discrimination claims under the MHRA may be proven by circumstantial evidence in accordance with the three-part burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Hoover v. Norwest Private Mortgage Banking, 632 N.W.2d 534, 543 (Minn. 2001) (citing Feges v. Perkins Rests., Inc., 483 N.W.2d 701-710-11 (Minn. 1992)). In order to establish a prima facie case of disability discrimination under the MHRA, a plaintiff must show that he or she (1) is disabled, (2) was qualified for the position from which he or she was discharged, and (3) was replaced by a non-disabled person.

The insuperable hurdle for Landers in this case is showing that he was a disabled person for the purposes of the MHRA. A person may be considered disabled under the MHRA if she or he: "(1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment." Minn. Stat. § 363.01, subd. 13 (2000). It is important to note that the MHRA was amended in 1989 make the state law definition different from and less stringent than the federal definition of a disability. Hoover, 632 N.W.2d at 545 n.8.

Even with the benefit of this less stringent requirement, however, Landers is unable to show that he was disabled for the purposes of the MHRA. Landers contends that he had a disability which materially impaired several major life activities. Looking to the ADA for guidance, Landers avers that major life activities include "caring for oneself, performing

manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). According to Landers, the effects of his Bell's palsy included his ability to see out of his left eye for several months, his ability to eat and drink, because his lip was lower than usual, his ability to drive for several months, and even his ability to kiss his wife. Landers also alleges that he was ostracized and ridiculed at work because of his partial paralysis. Finally, Landers claims that he suffered severe depression as a consequence of these difficulties and that his depression affected his ability to organize his thoughts and complete work in a timely fashion. See Pritchard v. Southern Co. Servs., 92 F.3d 1130, 1132 (11th Cir. 1996) (noting that depression may be a disability).

As Amtrak points out, however, when making a disability determination, the Court must consider the "nature, duration and long term impact of [the employee's] medical problems." Aucutt v. Six Flags Over Mid-Am., Inc., 85 F.3d 1311, 1319 (8th Cir. 1996). As a part of this case-by-case inquiry, the Court must take into account corrective measures, including the use of medications by the employee. See Sutton v. United Airlines, 527 U.S. 471, 477 (1999); Weber v. Strippit, 186 F.3d 907, 913 (8th Cir. 1999). Here, Landers underwent surgery for nerve decompression which corrected many of his difficulties. His own doctor has testified that by June 1998, Landers' condition had improved and Landers had regained between 70 and 80 percent of his facial functioning. Although Landers may have suffered material impairment of several major life activities for approximately a year after the onset of his Bell's palsy, there is no evidence that he was disabled at the time of his

termination. See Johnson v. Loram Maintenance of Way, Inc., 83 F. Supp. 2d 1007, 1013 (D. Minn. 2000) (noting that an employee must be disabled at the time of his termination in order to establish a claim for disability discrimination under the ADA and MHRA).

Landers has testified, in fact, that he is now fully capable of eating and drinking; his only limitation is that he cannot take a large mouthful of liquid. Landers has also testified that he can communicate clearly and effectively. If he becomes too excited, he must slow down when he talks, but this does not constitute a material impairment of his ability to speak. Similarly, following his surgery, Landers has no trouble seeing out of his left eye. In short, while the Court does not doubt that Landers' Bell's palsy may affect several of his major life activities, Landers has failed to adduce sufficient evidence showing that he is materially impaired with regard to these activities.

Landers has also suggested that his Bell's palsy materially impaired his ability to get along with others. See McAlindin v. County of San Diego, 192 F.3d 1226, 1234 (9th Cir. 1999) (holding that "[b]ecause interacting with others is an essential, regular function, like walking and breathing, it easily falls within the definition of 'major life activity'[under the ADA]"). But see Soileau v. Guilford of Maine, Inc., 105 F.3d 12, 15 (1st Cir. 1997) (stating that under the ADA the "ability to get along with others" is too vague to constitute a major life activity, although "a more narrowly defined concept going to essential attributes of human communication" might be considered a major life activity); Davis v. Univ. of North Carolina, 263 F.3d 95, 101 n.4 (4th Cir. 2001) (expressing doubt about whether the ability

to get along with others constitutes a major life activity under the ADA). Assuming for the purposes of this motion that interacting with others is a major life activity, Landers has not met his burden of showing that his ability to interact with others was materially limited. Even viewing the facts in the light most favorable to him, Landers has at most demonstrated that he was uncomfortable in social settings. This subjective impression is insufficient to show that he was materially limited in his ability to interact with others.

Finally, while Landers is correct that depression may be a disability, he has provided no evidence to show that any major life activity was materially impaired by his depression. If one infers that his claim is that his ability to work was impaired by his depression, his own deposition testimony eviscerates this claim. Landers has testified that he was fully able to perform his job with Amtrak even after the onset of the Bell's palsy and that he even exceeded the job requirements. Specifically, he testified that the 1999 fiscal year was the best year that he had ever had as an Amtrak employee because he "accomplished the most." (See Landers Dep. at 147.)

In short, Landers cannot establish a prima facie case of disability discrimination because he is unable show that he is a disabled person for the purposes of the MHRA. Accordingly, summary judgment is appropriate on Landers' disability discrimination claims.

**2. Defamation**

Landers argues that Smith's numerical ratings of his performance were defamatory. As an initial matter, the parties agree that the changes that Smith made to Landers'

performance review are subject to a qualified privilege, see Kletschka v. Abbott-Northwestern Hosp., Inc., 417 N.W.2d 752, 755 (Minn. Ct. App. 1988) (stating that a qualified privilege applies to statements made as part of a performance review), and thus are actionable only if Landers proves actual malice on the part of the Smith. See Lewis v. Equitable Life Assurance Soc'y, 389 N.W.2d 876, 891 (Minn. 1986).

In determining whether actual malice exists to defeat a qualified privilege, Minnesota courts focus on the defendant's attitude toward the plaintiff. See id.; Stuempges v. Parke, Davis & Co., 297 N.W.2d 252, 258 (Minn. 1980). To demonstrate actual malice, Landers must show that Smith changed the review numbers "from ill will and improper motives, or causelessly and wantonly for the purpose of injuring [Landers]." Stuempges, 297 N.W.2d at 257 (quoting McKenzie v. William J. Burns Int'l Detective Agency, Inc., 183 N.W. 516, 517 (Minn. 1921)). Landers may prove actual malice by: (1) evidence that leads to an inference that Smith knew that the numbers were false; (2) extrinsic evidence of personal ill-feeling; or (3) intrinsic evidence such as exaggerated language or the character of the language used. See Brooks v. Doherty, Rumble & Butler, 481 N.W.2d 120, 126 (Minn. Ct. App. 1992). Generally, the existence of actual malice is a fact question for a jury. See Kletschka, 417 N.W.2d at 756 (citing Frankson v. Design Space Int'l, 394 N.W.2d 140, 144 (Minn. 1986)).

In this case, Landers points to the fact that there are several substantial discrepancies between Smith's deposition testimony and the testimony of Erford and Erford's assistant

regarding the changes Smith made to Landers' performance review ratings. Although Amtrak contends that these discrepancies are the mere product of capricious recollection, the Court must give Landers the benefit of all reasonable inferences at this stage of the litigation. It is possible that a reasonable juror could infer from these discrepancies that Smith harbored ill-will towards Landers. Additionally, because the existence of actual malice is generally a fact question for a jury, the Court finds that there are genuine issues of fact regarding whether Smith acted with actual malice when she lowered Landers' performance review ratings.

Nevertheless, Amtrak contends that Landers cannot succeed with his underlying defamation claim. A statement is only defamatory if: (1) the statement was false; (2) it was communicated to someone other than the plaintiff; and (3) it tended to harm the plaintiff's reputation and lower him or her in the estimation of the community. Rouse v. Dunkley & Bennett, P.A., 520 N.W.2d 406, 410 (Minn. 1994). Amtrak has admitted for the purposes of this Motion that the allegedly defamatory numbers were communicated to a third party.

Amtrak argues, however, that Landers cannot show that the rating numbers were false. Apparently relying on the axiomatic distinction between opinions and facts, Amtrak urges this Court to find that numbers or rating scores may never be defamatory. In support of this conclusion, Amtrak cites generally to a case in which the Minnesota court of appeals held that a manager calling an employee a "troublemaker" was not defamatory because the phrase failed to suggest verifiably false facts about the employee. See McGrath v. TCF Bank Sav.,

FSB, 502 N.W.2d 801, 808 (Minn. Ct. App. 1993).

The instant case is distinguishable from McGrath, however. While the term "troublemaker" standing alone might not have been sufficiently tethered to specific facts to constitute defamation, the numerical ratings at issue in this case are tied to particular facts about Landers' performance. Indeed, Amtrak's contention that the performance review system was designed to help it implement its congressional mandate to reduce management costs and increase employee productivity undercuts any argument that the ratings were merely reflections of the groundless opinions of supervisors and peers. If Amtrak believed that the review process was a legitimate means of improving efficiency, then Amtrak must have believed that the ratings were a factually based reflection of its managers' performance.

Nevertheless, as Amtrak points out, Landers cannot show that three "3" ratings (defined as an employee meeting expectations and partially achieving goals) harm his reputation and lower him in the estimation of the community. Accordingly, Landers may only succeed on his defamation claim if he can show that the two "2" ratings (defined as an employee rarely meeting expectations) were false. See Benson v. Northwest Airlines, 561 N.W.2d 530, 537 (Minn. Ct. App. 1997) (stating that the plaintiff has the burden of proving that the allegedly defamatory statements were false).

Because Landers has noted that the written portion of the performance review differs dramatically from the "2" ratings that he received for safety and financial management, the accuracy of these two "2" ratings is a question of fact. Accordingly, summary judgment is

inappropriate on Landers' defamation claim.

### 3. Breach of Contract

Landers final claim is that Amtrak breached a 1981 employee handbook policy. Pursuant to Pine River State Bank v. Mettille, 333 N.W.2d 622, 632 (Minn. 1983), Landers claims that Amtrak's 1981 termination procedures, requiring initial verbal or written notice followed by a probationary notice and only then, if performance was still deficient, discharge, created a binding employment contract. Although Amtrak issued many subsequent handbooks, Landers argues that prior to 1993, Amtrak's termination policy did not have specific disclaimer language asserting that nothing in the handbook created a contract between the company and its employees.

Landers' breach of contract claim rests on the dubious proposition that subsequent handbooks with this sort of disclaimer language cannot supercede or replace existing handbooks without disclaimer language. To support this argument, Landers generally cites Feges v. Perkins Rest., Inc., 483 N.W.2d 701 (Minn. 1992). Even a generous reading of the Feges decision, however, does not support such a sweeping rule. The court in Feges simply held that a disclaimer in a subsequent policy, without more, was not sufficient to revoke previous handbook policies because the employer did not communicate its intent to revoke the prior policies to its employees. See id. at 708.

In this case, the memorandum accompanying the 2000 handbook states that "[t]hese revisions supercede existing policies." (See Landers Dep. Ex. 39.) This unambiguous

statement of Amtrak's intent to revoke or supercede previous policies distinguishes this case from Feges. Additionally, Landers has testified that he understood that the 2000 policy superceded previous policies. Accordingly, Landers' breach of contract claim fails as a matter of law.

**CONCLUSION**

For the foregoing reasons, and upon all the files, records, and proceedings herein, the Court determines that Landers has failed to demonstrate that he is a disabled person for the purposes of the MHRA. Landers therefore has failed to establish a prima facie case of disability discrimination. There are, however, genuine issues of material fact which preclude summary judgment on Lander's defamation claim. Finally, Landers' breach of contract claim fails as a matter law.

Accordingly, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Clerk's Doc. No. 27) is **GRANTED in part and DENIED in part** as follows:

1. Count III of the Complaint, alleging age discrimination under the MHRA, is **DISMISSED** as withdrawn;
2. Count II of the Complaint, alleging disability discrimination under the MHRA, is **DISMISSED**;
3. Plaintiff may proceed to trial on Count IV of the Complaint insofar as it alleges that Defendant defamed Plaintiff by lowering two of his performance review ratings to "2"; and

4. Count I of the Complaint, alleging breach of contract, is **DISMISSED**.

Dated: December 28, 2001

Paul A. Magnuson
United States District Court Judge